[L. A. No. 22037.   In Bank.   Jan. 18, 1952.]

JOHN W. GILL et al., Appellants, v. THE CURTIS PUB-
LISHING COMPANY (a Corporation) et al., Respond-
ents.

274

Shacknove & Goldman and Ben F. Goldman, Jr., for Appellants.

MacDonald & Pettit and Thomas H. McGovern for Respondents.

Loeb & Loeb, as Amici Curiae on behalf of Respondents.

CARTER, J.—█ A judgment on the pleadings for defendants, Curtis Publishing Company and Curtis Circulation Company, was granted pursuant to defendants' motion. The case is reviewed, therefore, the same as would be a judgment of dismissal entered following the sustaining of a general demurrer, and the allegations in plaintiffs' complaint must be taken as true, and so taken the question is whether a cause of action has been stated. (*Rannard* v. *Lockheed Aircraft Corp.*, 26 Cal.2d 149 [157 P.2d 1]; *Seeger* v. *Odell*, 18 Cal.2d 409 [115 P.2d 977, 136 A.L.R. 1291]; 21 Cal.Jur. 234 et seq.)

Plaintiffs are husband and wife. Defendants publish, circulate and sell for profit a monthly magazine named Ladies' Home Journal. Cartier-Bresson, a photographer, and Dahl, a writer, are in the employ of defendants.

Plaintiffs own and operate a confectionary and ice cream concession in the Farmers' Market in Los Angeles. They have a reputation for industry, integrity, decency and morality. Cartier-Bresson, in the course of his employment, photographed plaintiffs at their place of business without their knowledge or consent. The photograph depicts them apparently seated on stools side by side at the patron's side of the counter at their concession; plaintiff, Mr. Gill, has his arm around his wife and is leaning forward with his cheek against hers. The picture was published by defendants in their May, 1949, issue of the Ladies' Home Journal, in connection with an article entitled "Love" written by Dahl in the course of his employment. Under the picture appears the caption "Publicized as glamorous, desirable, 'love at first sight' is a bad risk." The article is a somewhat philosophical and sociological discussion of love between the opposite sexes and its relation to divorce. Love is classified generally on the basis of the extent it is founded upon "sex attraction" or "affection" and "respect." One of the classifications is called love at first sight, which is founded upon 100 per cent sex attraction, the kind which the photograph is captioned to portray. That kind of love is called the "wrong" one, not lasting and will be followed by divorce. In this connection, plaintiffs allege that the picture depicts them "in such a manner as to indicate said plaintiffs are loose, dissolute and immoral persons engaged in the so-called 'wrong kind of love' . . ."

Defendants knew, or should have . known, it is further asserted, plaintiffs were happily married and had a high moral reputation, but nevertheless, in a malicious disregard

of their rights and feelings, published and sold the magazine with the article and photograph; that such publication and distribution caused plaintiffs to be held up to public "scorn, ridicule, hatred, contempt and obloquy and did rob and deprive plaintiffs of the benefits of public confidence, respect and esteem and injure said plaintiffs in their business and social contacts and associations and in their reputations and health" to their damage in the sum of $200,000.

Recognition has been given of a right of privacy, independent of the common rights of property, contract, reputation and physical integrity, generally described as "the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short it is the right to be let alone." (*Melvin* v. *Reid*, 112 Cal.App. 285, 289 [297 P. 91].) Remedies have been afforded for the protection of that right. (See *Melvin* v. *Reid, supra*; *Cohen* v. *Marx*, 94 Cal.App.2d 704 [211 P.2d 320]; *Metter* v. *Los Angeles Examiner*, 35 Cal.App.2d 304 [95 P.2d 491]; *Kerby* v. *Hal Roach Studios*, 53 Cal.App.2d 207 [127 P.2d 577]; *Reed* v. *Real Detective Pub. Co.*, 63 Ariz. 294 [162 P.2d 133]; *Smith* v. *Doss*, 251 Ala. 250 [37 So.2d 118]; *Cason* v. *Baskin*, 155 Fla. 198 [20 So.2d 243]; *Corliss* v. *E. W. Walker Co.*, 64 F. 280 [31 L.R.A. 283]; *Pavesich* v. *New England Life Ins. Co.*, 122 Ga. 190 [50 S.E. 68]; *Bazemore* v. *Savannah Hospital*, 171 Ga. 257 [155 S.E. 194]; *Goodyear Tire & Rubber Co.* v. *Vandergriff*, 52 Ga.App. 662 [184 S.E. 452]; *McDaniel* v. *Atlanta Coca-Cola Bottling Co.*, 60 Ga.App. 92 [2 S.E.2d 811]; *Sikes* v. *Foster*, 74 Ga.App. 350 [39 S.E.2d 585]; *Sidis* v. *F-R Pub. Corp.*, 113 F.2d 806, dealing with California, Georgia, Kansas, Kentucky and Missouri law; *Paramount Pictures, Inc.* v. *Leader Press, Inc.*, 24 F.Supp. 1004; *State ex rel. Mavity* v. *Tyndall*, 224 Ind. 364 [66 N.E.2d 755]; *Kunz* v. *Allen*, 102 Kan. 883 [172 P. 532, L.R.A. 1918D 1151]; *Jones* v. *Herald Post Co.*, 230 Ky. 227 [18 S.W.2d 972]; *Itzkovich* v. *Whitaker*, 115 La. 479 [39 So. 499, 112 Am.St. Rep. 272, 1 L.R.A.N.S. 1147]; *Pallas* v. *Crowley Milner & Co.*, 322 Mich. 411 [33 N.W.2d 911]; *Munden* v. *Harris*, 153 Mo. App. 652 [134 S.W. 1076]; *Barber* v. *Time, Inc.*, 348 Mo. 1199 [159 S.W.2d 291]; *Flake* v. *Greensboro News Co.*, 212 N.C. 780 [195 S.E. 55]; *Norman* v. *City of Las Vegas*, 64 Nev. 38 [177 P.2d 442]; *McGovern* v. *Van Riper*, 137 N.J.Eq. 24 [43 A.2d 514]; *Bednarik* v. *Bednarik*, 18 N.J.Misc. 633 [16 A.2d 80]; *Hinish* v. *Meier & Frank Co.*, 166 Ore. 482 [113 P.2d 438]; *Holloman* v. *Life Ins. Co. of Virginia*, 192

S.C. 454 [7 S.E.2d 169, 127 A.L.R. 110]; Rest., Torts, § 867; 37 Va.L.Rev., 335; 22 So.Cal.L.Rev. 320; 48 Columb.L.Rev., 713; 4 Harv.L.Rev., 193; 41 Am.Jur., Privacy, § 5; 138 A.L.R. 22; 168 A.L.R. 446; 14 A.L.R.2d 750.) There are more states which have recognized such a right than have not, and the former represent the modern trend. (See cases collected 138 A.L.R. 22; 168 A.L.R. 446; 14 A.L.R.2d 750; 40 Columb.L.Rev. 713.) The arguments advanced by the authorities pro and con are summarized: ''One of the principal arguments advanced in support of the doctrine of privacy by its original exponents is that the increased complexity and intensity of modern civilization and the development of man's spiritual sensibilities have rendered man more sensitive to publicity and have increased his need of privacy, while the great technological improvements in the means of communication have more and more subjected the intimacies of his private life to exploitation by those who pander to commercialism and to prurient and idle curiosity. A legally enforceable right of privacy is deemed to be a proper protection against this type of encroachment upon the personality of the individual. While the early law gave redress only for physical interference with life and property, it is now recognized that man's spiritual nature also needs protection, and that his feelings as well as his limbs should be inviolate. In the formative period of the common law, before the day of newspapers, radio, and photography, when life was simpler and human relations more direct, the individual could himself adequately protect his privacy. Today this would be impossible, and to cast the individual upon his own resources in this regard would only result in a relapse into a system of private vengeance and violence which our civilization has outgrown. Freedom of speech and freedom of the press have been urged as a ground for denying the existence of the right of privacy. The right of privacy does undoubtedly infringe upon absolute freedom of speech and of the press, and it also clashes with the interest of the public in having a free dissemination of news and information. These paramount public interests must be taken into account in placing the necessary limitations upon the right of privacy. But if this right of the individual is not without qualifications, neither is freedom of speech and of the press unlimited. The latter privilege is subject to the qualification that it shall not be so exercised as to abuse the rights of individuals. Accordingly, it is held by courts recognizing the right of privacy

that the constitutional guaranties of freedom of speech and of the press do not warrant the publication of matter constituting an invasion of the right of privacy any more than they give the right to defame a person. The absence of precedent affirming the existence of the right of privacy has been stressed by the courts denying or doubting the existence of such a right. This was one of the principal grounds of the first decision repudiating the doctrine of privacy. But the courts adopting the other view take the position that the lack of specific precedent is not decisive. It has been objected that a recognition of the right of privacy would open up a vast field of litigation, some of it bordering on the absurd. But courts recognizing the right deny the validity of this objection. According to the latter view, the fact that a recognition of the right would involve many cases near the border line, and would present perplexing questions, is not a good ground for denying the existence of such right or refusing to give relief in a case where it is clearly shown that a legal wrong has been done. While it is clear that when dealing with injuries to feelings alone it is difficult to fix definite and practical limits separating that which is merely a trivial annoyance to a particular individual from that of which the law will take cognizance, the difficulty is not insurmountable. The supposed principle of law that remedies are not afforded for mental pain or distress or injuries to the sensibilities, where there is no other injury involved, has been asserted as an argument against the right of privacy.'' (41 Am.Jur., Privacy, § 9.)

We believe the reasons in favor of the right are persuasive, especially in the light of the declaration by this court 'that ''concepts of the sanctity of personal rights are specifically protected by the Constitutions, both state and federal, and the courts have properly given them a place of high dignity, and worthy of especial protection.'' (*Orloff* v. *Los Angeles Turf Club,* 30 Cal.2d 110, 117 [180 P.2d 321, 171 A.L.R. 913].)

■ The difficulty in defining the boundaries of the right, as applied in the publication field, is inherent in the necessity of balancing the public interest in the dissemination of news, information and education against the individuals' interest in peace of mind and freedom from emotional disturbances. When words relating to or actual pictures of a person or his name are published, the circumstances may indicate that public interest is predominant. Factors deserving consideration may include the medium of publication, the extent of

the use, the public interest served by the publication, and the seriousness of the interference with the person's privacy. In the instant case, it is not necessary to decide whether the article accompanying the photograph is news or information such as the public interest demands. It might be described as a nonfictional pseudopsychological or sociological discussion. ██ Assuming it to be within the range of public interest in dissemination of news, information or education, and in a medium that would not be classed as commercial—for profit or advertising—there appears no necessity for the use in connection with the article without their consent, of a photograph of plaintiffs. The article, to fulfill its purpose and satisfy the public interest, if any, in the subject matter discussed, could, possibly, stand alone without any picture. In any event, the public interest did not require the use of any particular person's likeness nor that of plaintiffs without their consent. The likeness is only illustrative of a part of the article, like a schematic diagram in a scientific dissertation, except that there is far less necessary pertinency. On the other hand, the impact on plaintiffs has been as alleged, and it is apparent from the article and caption under the picture, that they are depicted as persons whose only interest in each other is sex, a characterization that may be said to impinge seriously upon their sensibilities.

In *Melvin* v. *Reid, supra,* 112 Cal.App. 285, defendant exhibited a motion picture depicting degrading incidents in plaintiff's past life, using her maiden name, when she had reformed for eight years. It was held that such incidents as occurred during her trial for murder, being part of a public record, were clothed with a public interest, but that it was "unnecessary" to use her name in connection with other incidents in her life. On the other hand, in *Metter* v. *Los Angeles Examiner, supra,* 35 Cal.App.2d 304, the court felt the public interest in the news of a suicide by a woman from a downtown business building resulting in a news story and photograph of her overshadowed the invasion, if any, of her husband's right of privacy. The court found liability in *Kerby* v. *Hal Roach Studios, supra,* 53 Cal.App.2d 207, where an actress' name was signed to advertising material, consisting of a questionable letter, concerning a motion picture in which she did not have a part, pointing out that the publicity arising from her position as an actress did not justify the invasion. *Cohen* v. *Marx, supra,* 94 Cal.App.2d 704, turned upon the legitimate public interest in a public prize fighter.

Defendants urge, however, that there is not a sufficiently serious invasion of plaintiffs' privacy. In that connection, they refer to the Restatement where the right is stated: "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other." (Rest., Torts, § 867.) "The rule stated in this Section gives protection to the interest which a person has in living with some privacy, but this protection is relative to the customs of the time and place and to the habits and occupation of the plaintiff. One who is not a recluse must expect the ordinary incidents of community life of which he is a part. These include comment upon his conduct, the more or less casual observation of his neighbors as to what he does upon his own land and the possibility that he may be photographed as a part of a street scene or a group of persons. . . . On the other hand, liability exists only if the defendant's conduct was such that he should have realized that it would be offensive to persons of ordinary sensibilities. It is only where the intrusion has gone beyond the limits of decency that liability accrues. These limits are exceeded where intimate details of the life of one who has never manifested a desire to have publicity are exposed to the public, or where photographs of a person in an embarrasing pose are surreptitiously taken and published. . . . In determining liability, the knowledge and motives of the defendant, the sex, station in life, previous habits of the plaintiff with reference to publicity, and other similar matters are considered. A distinction can be made in favor of news items and against advertising use." (Rest., Torts, § 867, comments C & D.) We have seen that the caption under the picture describes it as "love at first sight" and the article says such love is based on 100 per cent sex. It is not unreasonable to believe such would be seriously humiliating and disturbing to plaintiffs' sensibilities, and it is so alleged, especially when we consider it deals with the intimate and private relationship between the opposite sexes and marriage. ■ If the test is, as defendants claim, what an ordinary man would consider such, then it is a question for the trier of fact rather than one of law.

■ Defendants rely upon cases where through their own acts or by an incident thrust upon them, a person's affairs became of public interest and he cannot recover for the publicity given; that they have waived their right of privacy. We have seen, however, that there was no legitimate interest

in using plaintiffs' likenesses in this article, and it may be added that there was no pressing need for speed which is customarily a factor in disseminating news. It should be observed, that referring to the use of a person's likeness for a legitimate public interest as not actionable because it indicates a waiver by the person of his right, is of doubtful validity, for it has been applied whether the publication having news value arose out of an incident of his own making or involuntarily and without his fault thrust upon him. We cannot agree that from the allegation in the complaint that plaintiffs' business is well known to persons throughout the world, puts the case within the category of legitimate and overriding public interest, for the article, and use of the photograph with it, was not aimed at giving news or information about plaintiffs' business.

The article may be interpreted as not dealing with actual recent or past events in the lives of actual persons. It is more a philosophical or psychological or semi-educational discussion of abstractions. Hence, such cases as *Sidis* v. *F-R Pub. Corp., supra,* 113 F.2d 806, dealing with the later career of a once infant prodigy, under a "Where Are They Now" heading, are not in point. Cases from New York are of little assistance, for there the court of appeals rejected the existence of a right of privacy and a statute which was passed creating the right limited it to the use of a person's name, picture or portrait "for advertising purposes, or purposes of trade." (See *Sarat Lahiri* v. *Daily Mirror,* 162 Misc. 776 [295 N.Y.S. 382].)

Plaintiffs do not allege that their right of privacy was invaded or that they suffered mental distress, assert defendants, and thus no cause of action is stated. Plainly the complaint alleges facts which clearly show a violation of plaintiffs' right of privacy. More is not necessary. It is alleged that in disregard of plaintiffs' feelings and rights the publication was made; that the article depicted plaintiffs as dissolute and immoral persons and robbed them of public esteem; that by reason of the acts alleged, plaintiffs were damaged in the sum of $200,000. We think that it may be at least inferred therefrom that their feelings were hurt and they suffered mental anguish. The proceeding is, as heretofore stated, to be treated as though a general demurrer had been sustained. So treated, the complaint states a cause of action. (*Hudson* v. *Craft,* 33 Cal.2d 654 [204 P.2d 1, 7 A.L.R.2d 696].)

It is said the allegation that the publication depicts plaintiffs as dissolute persons and holds them up to public

scorn and ridicule are conclusions of law. We do not think so. The published article and likeness are attached to the complaint, and as seen from the foregoing discussion, they are susceptible of the construction placed thereon by plaintiffs.

Judgment reversed.

Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.