45 So.2d 195 (1950)
RICE
v.
ARNOLD.
Supreme Court of Florida, Special Division B.
March 24, 1950.
John D. Johnson and G.E. Graves, Jr., Miami, for appellant.
J.W. Watson and John D. Marsh, Miami, for appellee.
CHAPMAN, Justice.
This is an action in mandamus originating in the Circuit Court of Dade County, Florida, stemming from the following factual situations: The City of Miami owns and operates golf links known as the Miami Springs Country Club for the use and enjoyment of its citizens and residents and *196 their guests. The city delegated to the respondent, H.H. Arnold, the authority to supervise and manage the golf course, inclusive of the power to promulgate reasonable rules and regulations necessary for the use and enjoyment thereof in behalf of the public. The petitioner, a colored man, on April 27, 1949, requested of the respondent the right and privilege to play on the municipally owned golf links, but the request, it is contended, was arbitrarily and unlawfully denied.
The respondent, superintendent of the Miami Springs Country Club, concedes that the petitioner is a colored man, a citizen and resident of the City of Miami; now and for many years past a general policy of segregation of races has existed in both the State of Florida and City of Miami. The Miami Springs Country Golf Course until recently has been used exclusively by golfers of the white or Caucasian race, as no demands to use the course were made by Negroes until April 11, 1949, when several colored men, after complying with all the rules of the golf links were permitted to use the golf course, when the dates of playing and the number of Negro golf players were accurately recorded. This record reflects the following:
"April 12th, 1949, Tuesday  8 players;
"April 13, 1949, Wednesday  6 players;
"April 14, 1949, Thursday  12 players;
"April 15, 1949, Friday  52 players;
"April 16, 1949, Saturday  8 players;
"April 17, 1949, Sunday  6 players.
The costs of maintenance and operation of the Miami Springs Country Club Golf Course are paid exclusively from green fees paid by golfers for the use of the course and in order that it remain a self sustaining project it is essential that an average of 200 golfers daily use the course and pay the prescribed fees. The white patrons of the course refused and have declined to patronize the golf course and share the facilities thereof at the same time with the Negro golfers. The total revenues arising from the small number of Negro players using the course and paying the green fees, when standing alone, are insufficient to pay the actual operating and maintenance costs of the links. The golf course facilities previously supplied the citizens and residents of Miami will be abandoned (a) if the use of the course is exclusively restricted to the Negro golfers, because it will not be financially self sustaining; (b) if Negro golfers are permitted to share the facilities of the course with the white golfers the latter will not patronize it, thereby resulting in an operational loss.
Pursuant to the existing general policy of segregation and in order to make the facilities of the golf course available to the public and usable by the two races and to avoid an abandonment thereof, the respondent superintendent adopted a rule for the operation of the links applicable to both Negro and white golfers. The Negro golfers under the rule use the facilities of the course one day each week and the white golfers use it the remaining six days of the week. The rule or policy so adopted and now in force and effect designate the days of the week in which white golfers will be allotted the exclusive use of the facilities of the golf course; and the days of the week in which the exclusive use of the facilities of the golf course will be allotted to Negro golfers. Pursuant to an administrative policy and in behalf of the public interest the above rule was adopted by the Superintendent of the course which allotted the facilities of the course at different times to the white and colored golfers. If the ratio of colored golfers requesting the use of the facilities of the course shall from time to time increase, then the rule supra promulgated may or can be altered to conform to the demands of an increased number of colored golfers, thereby accommodating all citizen and resident golfers and their guests as to the facilities of the course without regard to race or color. Under the operation of this rule the two races now and for some time past have used and enjoyed the recreational facilities of the course.
The commands of the alternative writ as issued required the respondent to permit the relator the use of the facilities of the Miami Springs Country Club Golf Course "during all of the hours in which the course is usually open or show cause before the Court for his refusal so to do". In the order denying *197 the relator below a peremptory writ of mandamus as prayed for the trial court, in part, said: "In a determination of this case it must be noted at the outset that the command of the alternative writ would require that the city's public golf course superintendent permit the relator to use the course at all hours when it is open to public play. In order for relator to be entitled to a peremptory writ of mandamus it must appear that there is a clear legal duty for the respondent to comply and perform".
The controlling question presented by the record is viz.: Are the constitutional rights of the relator-appellant violated by the rule adopted and now in effect regulating the use of the facilities of the Miami Springs Country Club Golf Course owned and operated by the city and maintained exclusively by the green fees paid for the facilities by the golfers? The white and Negro golfers functioning under the rule use the facilities of the course, but on different days of the week. It appears that if the Negroes are permitted the use of the course with the white golfers, then the white golfers will not patronize the course. The green fees paid by the Negro golfers are insufficient to support and maintain the course. The rule allows the Negro golfers to use the course one day of the week and the white golfers six days. It is argued that the adopted rule avoids a clash of the two races; funds are made available to the city with which to supply golfing facilities to the public; golfing facilities can be supplied the public by the city only in the manner provided for by the rule, otherwise the services will be abandoned.
Counsel for relator-appellant contend that the rule, supra, violates the 14th Amendment to the Federal Constitution; Section 1 of the Declaration of Rights of the Florida Constitution, F.S.A.; it is contrary to the holdings of the Supreme Court of the United States as enunciated in State of Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; McCabe v. Atchison, Topeka & Santa F.R. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664, and similar cases. It is not contended that the City of Miami must maintain a golf course for the use and benefit of the Negroes but since the city elected to supply golfing facilities to the public, then equal facilities must be provided to the relator and other members of the Negro race; that the relator-appellant and white golfers have a constitutional right to play the course at all times when it is open to the public.
It is generally conceded that an equal protection of the law operates as a protection against any state action, or municipality as an arm of the state, by statute or otherwise, which denies to any person equal protection on account of race or color. If substantially equal accommodations, facilities or privileges, are provided for persons of different races, then there is no violation of the equal protection clause of the Federal Constitution. Thus it has been held that a state may constitutionally forbid the co-education of different races in the same private school. Berea College v. Commonwealth, 123 Ky. 209, 94 S.W. 623, 124 Am.St.Rep. 344, 13 Ann.Cas. 337, on appeal Berea College v. Kentucky, 211 U.S. 45, 29 S.Ct. 33, 53 L.Ed. 81. It may assign different portions of parks for the exclusive use of different races. Warley v. Board of Park Comm'rs, 233 Ky. 688, 26 S.W.2d 554. It may prohibit the sale of liquor to different races at the same saloon. State ex rel. Tax Collector v. Falkenheiner, 123 La. 617, 49 So. 214.
In the case of State ex rel. Weaver v. Board of Trustees, 126 Ohio 290, 185 N.E. 196, Dorris Weaver, a colored girl, in a mandamus action sought admission to a "Home Economics Course" of the University of Ohio. The Home was so managed that the white students bought groceries, cooked and dined together as a common enterprise. They lived together two in a room with roommates of their own selection and had a common bath and toilet facilities. The relator was by the University authorities granted living quarters equipped in a similar manner to other buildings on the campus and no one interfered with her rights and privileges in pursuing the educational *198 courses offered and she had an opportunity to entertain her friends and associates as granted to other students. She had been denied the privilege of residing and associating with white students and partaking in their family or communal life. Mandamus was denied  the court pointed out that when the government secured to each of its citizens equal rights before the law, equal opportunity for improvement, it had accomplished the end for which it was organized. Courts are powerless to eradicate social instincts or to abolish distinctions based on physical differences and the attempt to do so only accentuates existing difficulties. It cannot be overlooked that persons of the same tastes and desires, whether white or black, usually associate together to enjoy themselves to the best advantages. People generally move in the circles in which they are likely to be suited or matched. The reason for the rule was to prevent friction between the white and negro golfers on the course.
The relator-appellant requests this Court to hold as a matter of law that he is entitled to use the city's golf course at all hours and times it is open to play despite the findings of fact in the court below that he now enjoys substantially equal accommodations provided for persons of the different races. It does not appear by the record that the one day allotment of the facilities of the course to the Negroes discriminated against the Negro race. The days of playing each week were apportioned to the number of white and colored golfers according to the record of the course kept by the respondent. If an increased demand on the part of the Negro golfers is made to appear, then more than one day each week will be allotted.
Mandamus is a legal remedy which is not always awarded as a matter of right but in the exercise of sound judicial discretion, and then only when based on equitable principles. The relator must establish a clear legal right to its issuance and further show that no other adequate remedy exists. State ex rel. Dixie Inn v. City of Miami, 156 Fla. 784, 24 So.2d 705, 163 A.L.R. 577. Reversible error has not clearly been made to appear.
Affirmed.
ADAMS, C.J., HOBSON, J., and TAYLOR, Associate Justice, concur.